**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HA. L. HOANG and NAM L. HOANG, | : | |
| | : | Civil Action No. 1:07-CV-799 |
| Plaintiffs | : | |
| | : | (Chief Judge Kane) |
| v. | : | |
| | : | |
| FUNAI CORPORATION, INC. et al., | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

Before the Court is Defendants' motion in limine to exclude the expert opinion testimony

of Bradley A. Schriver ("Schriver") and Ronald J. Panunto ("Panunto") under Rule 702 of the

Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579

(1993).  The motion is fully briefed, the Court has heard testimony from the experts, and the

issues are ripe for disposition.  For the following reasons, the motion will be denied.

## I.     BACKGROUND

### A.  Factual and Procedural Background

Plaintiffs initiated this action in the Court of Common Pleas of Philadelphia County,

Pennsylvania on December 19, 2006, and it was timely removed to the United States District

Court for the Eastern District of Pennsylvania.  In March 2007, the Eastern District transferred

the action, and another with which it had been consolidated, to this Court.[1]  (Doc. Nos. 1-13.)

The Plaintiffs Ha. L. Hoang and Nam L. Hoang seek to recover for personal injuries and

property damage suffered when a residential fire broke out at a house at 1008 Hudson Street in

---

[1]  The Hoangs' case had been consolidated with a separate and related action brought by Allstate Insurance
Company against the same parties to recover for payment on the Hoangs' homeowner policy.  In January 2008,
Allstate moved to voluntarily dismiss its case, and the Court granted the motion.  (Doc. Nos. 18; 21.)

Harrisburg, Pennsylvania, on December 29, 2004. (Doc. No. 15-3, ¶¶; 42-45.) The house was owned by Nam Hoang and he lived there with his sister Ha Hoang and his mother Ken Tran. (<u>Id.</u> ¶¶ 29-31.) The Plaintiffs' experts have opined that the fire was caused by a defect in a Sylvania combination television/video cassette recorder ("TV/VCR") that was manufactured and sold by the Defendants. (<u>Id.</u> ¶¶ 33-47.) The present motion before the Court challenges the reliability of the methodology used by Plaintiffs' experts in reaching that conclusion.

### B. Standard of Review

The Supreme Court has held that the trial court has "a special obligation" to ensure that any and all expert testimony is not only relevant but reliable. <u>Kumho Tire Co., Ltd., v. Carmichael</u>, 526 U.S. 137, 147 (1999) (quoting <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993)). This special obligation has been likened to a "gatekeeping role" for the trial judge. <u>Daubert</u>, 509 U.S. at 597. Accordingly, the admission of scientific, technical, or other specialized knowledge is within the discretion of the district court. <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 146-47 (1997).

This inquiry is controlled by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As the Third Circuit has explained, these requirements represent the "trilogy

of restrictions on expert testimony: qualification,[2] reliability and fit." <u>Calhoun v. Yamaha Motor Corp. U.S.A.</u>, 350 F.3d 316, 321 (3d Cir. 2003) (citing <u>Schneider v. Fried</u>, 320 F.3d 396, 405 (3d Cir. 2003)).

When considering the reliability requirement, the Supreme Court has held that the gatekeeping function requires the trial court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire</u>, 526 U.S at 152. To meet this requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable . . . [but] the evidentiary requirement of reliability is lower than the merits standard of correctness." <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 244 (3d Cir. 2008). When evaluating the reliability of a witness's methodology, a court is guided by several familiar factors drawn from *Daubert*:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

<u>Calhoun</u>, 350 F.3d at 321 (citing <u>Paoli</u>, 35 F.3d at 742 n.8). These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." <u>Kumho Tire</u>, 526 U.S. at 150. Accordingly, the Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant

---

[2] Though the Defendants' brief raises the qualification issue, the parties represented to the Court at the hearing on this motion that Defendants would not challenge the experts' qualifications. (See Daubert Hr'g. Tr. at 3:23-4:4.(hereinafter "Hr'g. Tr.")).

factors.  <u>Calhoun</u>, 350 F.3d at 321.

The final requirement is fit, which means "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."  <u>Id.</u> (quoting <u>Schneider</u>, 320 F.3d at 405). "Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  <u>Daubert</u>, 509 U.S. at 591-92.  This inquiry goes primarily to relevance because expert opinion which does not relate to a disputed issue is not relevant and cannot assist the trier of fact as required by Rule 702.  <u>Id.</u>  As the Supreme Court has explained,

> [t]he study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact.  However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

<u>Id.</u>  Like the typical relevance inquiry, the standard for analyzing the fit of an expert's analysis to the case at hand is "not that high."  <u>United States v. Ford</u>, 481 F.3d 215, 219-20 (3d Cir. 2007) (quoting <u>Paoli</u>, 35 F.3d at 745).  But, expert testimony can be powerful and misleading because of the difficulty in evaluating it, and the Third Circuit has cautioned that district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of *Daubert*.  <u>Id.</u> at 219 n.6.

## II.    DISCUSSION

### A.  Schriver

#### 1.  Report

Schriver investigated the cause and origin of the fire that occurred at the Hoangs' home on December 29, 2004.  (Doc. No. 33-4, Ex. 1 at 1 (hereinafter "Schriver Report").)  His expert

report describes his inspection of Nam Hoang's home on March 28, 2006. Schriver testified that his cause and origin investigation was guided by NFPA 921, Guide for Fire and Explosion Investigations, published by the National Fire Protection Association. (Hr'g. Tr. at 9:22-10-11.) Several courts, including this one, have recognized that NFPA 921 offers a comprehensive and detailed treatment for fire investigation and have held its methodology is reliable for purposes of Rule 702. See e.g., Booth v. Black & Decker, Inc., 166 F. Supp. 2d. 215, 220 (E.D. Pa. 2001); United States v. Zhou, No. 06-cr-286, 2008 WL 4067103, *5 (D. N. J. 2008) (citing Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054, 1057-58 (8th Cir. 2005)).

During the inspection, Schriver examined all areas of the house, working from areas with the least amount of damage to areas with the most. (Schriver Report at 4-5; Hr'g Tr. at 5:3-8.) While the living room showed fire damage, the rest of the first floor, second floor, and exterior of the home showed only smoke damage. (Schriver Report at 4-5.) Schriver observed that the fire damage was contained to just the east wall of the living room, between the doorway and an entertainment unit. (Id. at 5.) Though located on the front porch of the home at the time of the inspection, a small wooden table, upon which sat the TV/VCR unit at issue, was reportedly located along this wall when the fire began. (Id. at 7; Hr'g. Tr. at 6:1-11.) The baseboard along this section of wall and beneath where the table had been located showed heavy charring. (Schriver Report at 5.) The table itself had also been heavily damaged. (Id.) Schriver noted that one corner of the table had been entirely consumed and that a green plastic substance was observed melted and adhered to the surface of the table. (Id.) From this investigation, Schriver concluded that the origin of the fire was on the small wooden table. (Id. at 9.)

Having determined the area of origin for the fire, Schriver proceeded to examine any

potential sources of the fire in that area.  (Id. at 5.)    A two-way electrical light switch mounted above the small table did not show any evidence of malfunction.  (Id.)  The heavily damaged TV/VCR unit was left on the floor after the table had been removed.  (Id.)  The TV/VCR was reportedly plugged into a surge protector and powered by a power outlet on the south wall of the living room; the power cord, surge protector, and outlet showed no signs of malfunction or failure.  (Id. at 3.)  Schriver also considered potential "open flame" devices that could have been placed on the table; he eliminated these as sources because his own investigation did not reveal any evidence of such devices in the immediate vicinity (Hr'g Tr. at 9:18-21) and interviews with Nam Hoang and city fire investigators revealed no indication of unattended lit candles or incense left near the table.  (Id.)  From this investigation, Schriver concluded that the only remaining ignition source was the TV/VCR, which he could not eliminate as a cause of the fire.  (Id. at 9.)

### 2.  Challenge

The Defendants contend that Schriver's opinions fail to meet the reliability threshold required by *Daubert* and Rule 702.  (Doc. No. 33 at 12)  In support of this contention, the Defendants suggest several problems with Schriver's methodology: (1) his investigation was aimed at corroborating conclusions reached by others before him; (2) the report provides no indication that the methodology employed in the investigation was reliable based on the *Daubert* factors; (3) he relied on unreliable interviews with family members and a Dauphin County Detective to eliminate other possible ignition sources such as candles and incense burners; and (4) his opinion is at odds with the physical evidence.  (Id. at 12-14.)  The Defendants also contend that Schriver's proposed testimony does not satisfy the "fit" requirement because his conclusion is merely that he could not eliminate the TV/VCR as a cause of the fire, which would

invite the jury to speculate.  (Id. at 15.)  The Plaintiffs dispute these contentions, arguing that

Defendants challenges are merely disagreement with Schriver's conclusions and are properly

raised on cross-examination.  (Doc. No. 35 at 3-4.)  The Court will address these issues as they

were argued by the parties.

### a.  Improper Presumption and Reliance

The Defendants suggest that Schriver's investigation was unreliable because it was

"apparently aimed at corroborating conclusions reached by others before him whose opinions are

not independently admissible."  (Doc. No. 33 at 12.)  Presumably, Defendants refer to Schriver's

interviews with the city fire investigators, who performed an investigation into the origin and

cause of the fire after it was extinguished.  (Schriver Report at 2.)  The city fire investigators

concluded that the fire was accidental and most probably caused by an internal malfunction of

the TV/VCR combination unit located on the small wooden table inside the front door.  (Schriver

Report at 2; 7.)  Defendants raise two concerns with these interviews.  First, Defendants suggest

that Schriver approached his investigation "with the hypothesis that the TV/VCR unit may have

caused the fire," (Doc. No. 33 at 13), in contradiction to Section 4.3.7 of NFPA 921, which

provides as a basic tenet that "[a]ll fires . . . should be approached by the investigator without

presumption."  (Doc. No. 33-4 Ex. 3.)  Defendants also rely on an unreported case from the

Eastern District of Pennsylvania, holding that a fire expert's opinions are unreliable when he

approaches a fire "putting the cart before the horse."  Chester Valley Coach Works, Inc. v.

Fisher-Price, Inc., No. 99-CV-4197, 2001 WL 1160012, *5 (E.D. Pa. 2001) ("Indeed, the

evidence in this record suggests that all of the independent investigators investigated the origin

of the fire before looking for causes within that origin.  Only Kaczmarczik, who had a

preconceived notion of what the cause might be, located the fire's origin in the northern part of the building where the Bigfoot vehicles had been."). The Defendants next argue, relying on In Re TMI Litigation, 193 F.3d 613 (3d Cir. 1999), that Schriver's opinions should be excluded because he failed to independently assess the validity of the city investigators and demonstrated "unblinking reliance" on county fire investigators instead of independently assessing the validity of their assumptions and opinions. (Doc. No. 38 at 5.)

The Court must reject the Defendants' contentions. There is no indication from the record either that Schriver's knowledge of past investigations into the fire colored his own investigation or that he "unblinkingly relied" on the conclusions of the city fire investigators such that would invalidate his methodology. The report details his efforts to make his own independent origin and cause determination. He first examined the entire exterior and interior building for damage to narrow down the origin and then evaluated all potential sources of the fire in that origin area, eliminating them one by one. This alone distinguishes Schriver's investigation from the one performed by the expert in Chester Valley, who admitted to starting his investigation by examining and testing two toys as potential causes of the fire and then proceeding to assess the fire's origin—a direct contradiction of NFPA 921's method of first establishing the origin of the fire before investigating the potential causes. Further, in In re TMI Litigation, the Third Circuit similarly noted that the expert admitted that "he never made any attempt to assess the validity of any of the assumptions the other experts used to formulate their opinions" and "ignored his own stated principles of risk assessment." In this case, Schriver appears to have followed the NFPA's guideline—so far as the excerpts of that guideline provided to the Court show—by collecting information on prior investigations into the fire:

> [h]aving determined that a problem exists, the investigator or analyst should define in what manner the problem can be solved. In this case, a proper origin and cause investigation should be conducted. This is done by an examination of the scene and by a combination of other data collection methods, such as the review of previously conducted investigations of the incident, the interviewing of witnesses or other knowledgeable persons, and the results of scientific testing.

(Doc. No. 33-4 Ex. 3.) Additionally, the Defendants have not pointed to sufficient evidence in the record to support their contention that Schriver had unblinking reliance on the results of the city detectives' investigation. As such, the Court rejects Defendants challenges on this basis to Schriver's report.

### b. Lack of Reference to Methodology in Expert Report

The Defendants contend that Schriver's report "provides no indication that the methodology employed by the expert witness "was subject to peer review, had a known or potential rate of error, could be measured against existing standards, or was generally accepted . . . ." (Doc. No. 33 at 13.) It is true that there is no reference to the methodology guiding Schriver's fire investigation in his report. Despite this, Schriver testified that his investigation was guided by the NFPA 921 guidelines, (Hr'g. Tr. at 9:22-10-11), and the report makes clear that he is conducing an "origin and cause" investigation. (Doc. No. 33-4 Ex. 3.) Based on the description of steps he took during his investigation, it appears that he was following the NFPA 921 standards. As noted above, the NFPA 921 methodology is widely considered to be reliable for purposes of Rule 702. Accordingly, the Court finds that Schriver employed a methodology that was subject to peer review, had a known or potential rate of error, could be measured against existing standards, and is generally accepted.

### c. Unreliable Opinion on Ignition Sources and Fire Origin

The Defendants argue that Schriver unreliably eliminated other possible ignition sources, such as candles or incense burners, by interviews with the Hoangs and with city fire investigators. (Doc. No. 33 at 13-14.) Defendants complain that the statements of Nam Hoang are suspect as a family member who is interested in the outcome of the case. (Id.) Defendants also take issue with Schriver's failure to undertake further investigation or perform any forensic testing to confirm the interview statements and rule out the possibility of candles or other "open flame" devices. (Id.)

From review of his report and testimony at the hearing, it appears Schriver relied on three pieces of data to eliminate a potential open flame cause: (1) his investigation turned up no evidence of such devices in the area of origin (Hr'g. Tr 9:18-21.); (2) Nam Hoang told him in an interview that no one in the family smoked and that he did not recall any candles or incense burners having been placed on the wooden table (Schriver Report at 8); and (3) the city fire investigators, who investigated the site just after the fire was extinguished, informed him that they did not find any evidence of "an ashtray, candle, or any other open flame type device near the table during his inspection" (Hr'g. Tr. 25:17-23; Schriver Report at 7). Schriver admits, however, that he did observe some candles and incense sticks in the home. (Hr'g. Tr. at 20:5-10.)

The Defendants similarly challenge Schriver's conclusion that the fire originated on the small wooden table that held the TV/VCR unit. Because of charring found on the baseboard beneath the table and on the underside of the table itself, Defendants argue that this conclusion "is dubious because it does not square with the physical evidence." (Doc. No. 33 at 14; Hr'g. Tr. at 14:13-25.) Defendants state that "[i]t does not take an expert to recognize that fires burn

upwards, not downwards.  (Doc. No. 33 at 15.)

In his report, Schriver explains that "burn patterns and physical evidence" led to his conclusion that the fire originated on the small wooden table.  (Schriver Report at 6.)  The evidence he observed during his inspection included consumed paint and burn patterns along the wall where the table sat (Schriver Report at 3; 5), burn damage to the table itself (Schriver Report at 5-6), burn damage to the TV/VCR (id.), and somewhat undamaged carpeting on the floor underneath the table (Hr'g. Tr. at 28:9-19).   Schriver does admit that the underside of the table was burnt and that parts of the top of the table appeared to not have been charred by fire. (Hr'g. Tr. 13:16-21.)

The Defendants are largely challenging Schriver's conclusions drawn from his investigation.  When considering expert testimony, as set out above, "[t]he test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct.  Rather, the test is whether the 'particular opinion is based on valid reason and reliable methodology.  The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination.'"  Oddi v. Ford Motor Co., 234 F.3d 136, 145-46 (3d Cir. 2000) (quoting Kannankeril v. Terminix International Inc., 128 F.3d 802, 806 (3d Cir. 1997)). Despite this, a district court still must consider an expert's conclusions to assess whether they could reliably flow "from the facts known to the expert and the methodology used."  Id. at 146 (quoting Heller v. Shaw Industries, Inc., 167 F.3d 146, 153 (3d Cir. 1999).  "A court may conclude that there is simply too great a gap between the data and the opinion proffered."  Id. However, even where the court believes that "there are better grounds for some alternative conclusion, and that there are some flaws in the scientist's methods, if there are 'good grounds'

for the expert's conclusion, it should be admitted." Heller, 167 F.3d at 152-53 (citing In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 744 (3d Cir. 1994)).

In this case, the Court finds that there is not such a great gap between the data and the conclusion reached to render Schriver's opinion unreliable. As to the challenge that Schriver eliminated the possibility of an open flame on the table in a "desultory fashion," it is clear from the discussion above that reliable sources of methodology on fire investigation appear to condone review of previously conducted investigations along with the interviewing of witnesses and other knowledgeable persons as a viable "data collection method." (Doc. No. 33-4 Ex. 3.) Though Defendants clearly disagree with Schriver's use of these interviews and the conclusions drawn from the statements, the Court finds that Schriver had at least good grounds for concluding that open flame devices were not a potential ignition source based on these interviews and his own examination.

The Court will similarly reject Defendants' challenge to Schriver's conclusion that the fire originated on top of the table. Though it is clear that there is conflicting physical evidence, as admitted by Schriver himself, such conflict does not warrant exclusion of Schriver's conclusions. The Court finds that there is not too great a gap between the data relied on and the conclusion drawn by Schriver. Under these circumstances, cross-examination is sufficient for the Defendants to challenge the weight of Schriver's conclusions. See e.g., Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 415 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.") Accordingly, Defendants challenges to Schriver's testimony on these grounds will be denied.

**d. Fit**

Defendants lastly claim that Schriver's proposed testimony does not fit the issues before the Court and does not assist the trier of fact. (Doc. No. 33 at 15.) Defendants argue that Schriver's ultimate conclusion—an internal defect with the television/VCR unit could not be eliminated as a cause of the fire—only "invites the jury to speculate that a defect in the TV/VCR was the cause of the fire." Schriver candidly admitted in his testimony that he cannot offer the ultimate opinion that the TV/VCR caused the fire: "never once will you see in any of my reports that I had authored that I believed that the TV/VCR unit caused the fire. It was an ignition source potential ignition source in the area of the fire's origin that I could not eliminate." (Hr'g. Tr. at 19:16-20.) He further testified that it was the only ignition source in the area that he could not eliminate. (Hr'g. Tr. at 9:16-18.)

The Court must reject the Defendants' argument. Fit is a low theshold to pass, and Schriver's inspection of the premises, origin determination, and analysis of the potential sources of the fire is relevant to the issues before the Court. As argued by the Plaintiffs, this testimony would appear to have a valid scientific connection to the pertinent inquiry in this case as the process of elimination is endorsed, albeit in limited circumstances, as a method of determining the source of a fire by the NFPA 921 manual. (Doc. No. 33-4 Ex. 3.) Accordingly, the Court finds that Schriver's proposed testimony satisfies the fit requirement of Rule 702.

Based on the record and the discussion above, the Court is satisfied that the Plaintiffs have met their burden to show that Schriver followed reliable methodology and that he has at least good grounds for his conclusions

**B. Panunto**

13

### 1. Report

Panunto performed an examination of the TV/VCR at issue, following Schriver's inspection described above, to determine if it caused the fire. (Doc. No. 33-4 Ex. 2 at 1 (hereinafter "Panunto Report").) Panunto testified that he was intimately familiar with the NFPA 921 guidelines and that he did not deviate from them in the process of conducting his inspection. (Hr'g. Tr. at 30:13-21.) In preparing his report, Panunto examined X-rays of the TV/VCR unit, photographs of the fire scene, incident reports of the Harrisburg Police and Bureau of Fire, and statements of Nam Hoang and Kien Tran. (Panunto Report at 1.) Panunto first examined the photographs of the scene and concluded that the fire did originate on the table along the wall of the living room where the TV/VCR unit was located. (Panunto Report at 2.) He then examined the photographic evidence of the other potential sources of the fire at that origin, and determined that their condition eliminated any possibility that they were the source of the fire. (Id.) Finally, he examined the remains of the TV/VCR unit, which showed "catastrophic fire damage," especially to the VCR tape transport mechanism. (Id.) He testified that there were several sources of high voltage components in the TV/VCR that provided sufficient energy to ignite the fire. (Hr'g. Tr. at 36: 17-25.) Though X-ray analysis of the unit did not reveal the particular component that failed, Panunto observed burn patterns indicating that the fire began inside the set, near or at the VCR tape transport assembly. (Panunto Report at 2.)

From this examination, Panunto concluded that the TV/VCR was defective and that it caused the fire. (Id.) Panunto explained that despite the inconclusiveness of the X-ray testing, it was possible to conclude that TV/VCR unit caused the fire by the process of elimination under

NFPA 921, Section 18.2.1.  (Id.)  Having determined that the origin was clear and that all other potential sources of fire in the area of origin were eliminated, Panunto concluded, based on the NFPA methodology, that the TV/VCR unit caused the fire.  (Hr'g. Tr. at 37:8-38:9; 40:19-25.)

### 2. Challenge

Defendants argue that Panunto's opinion merely "piggy-backs" on the findings and conclusions of Schriver and city fire investigators.  (Doc. No. 33 at 16.)  Defendants further contend that it is impossible for Panunto to offer a competent opinion regarding the origin of the fire because he never personally visited the fire scene but relied on observations and photographs from Schriver and others.  (Id. at 17.)  Because of these reasons, Defendants claim that Panunto's opinions were made without an independent basis and therefore should be excluded as unreliable.  (Id.)  Plaintiffs argue that Defendants' challenges go to Panunto's conclusions and not to his methodology.  (Doc. No. 35 at 5.)

The Court will reject the Defendant's challenge.  As above with Schriver, Defendants' contention seems largely based on the fact that Panunto reviewed prior investigations of the origin and cause of the fire, a practice approved by the NFPA 921 guidelines excerpted in the Defendants' exhibits.  (Doc. No. 33-4 Ex. 3.)  The record shows that Panunto conducted an independent review of the above-mentioned materials and performed his own examination of TV/VCR unit remains, which no one else had fully examined at that point.  The Defendants have not supported their claim that Panunto's investigation and conclusions do not have an independent basis or that he merely "piggy-backed" on the conclusions of other investigators.  Though Panunto clearly relied to some extent on observations from other investigators, there is no indication that he blindly accepted their conclusions such that his methodology was

unreliable.  Further, the case cited by the Defendants, <u>Kozar v. Sharp Electronics Corp.</u>, No. 04-901, 2005 WL 2456227, *2-3 (W.D. Pa. 2005), is clearly distinguishable.  In that case, the Plaintiffs' cause and origin expert testified that he relied "solely and entirely" on an electrical engineer's cause and origin findings, even though the electrical engineer was not qualified to give such an opinion.  <u>Id.</u>  Additionally, the Defendants cite to no authority for the proposition that it is inherently unreliable for an expert such as Panunto to rely on photographs and prior reports taken from the scene of the fire in lieu of a personal visit, and they have not persuasively demonstrated that Panunto's reliance on such material in this particular case would render his methodology unreliable.  Indeed, experts in similar cases have relied on photographic evidence of the fire scene in their analysis.  <u>See</u> <u>Erie Ins. Exchange v. Applica Consumer Products, Inc.</u>, No. 02-CV-1040, 2005 WL 1165562, 7 (M.D. Pa. 2005); <u>see also</u> <u>Travelers Property Cas. Co. of America v. Cooper Crouse-Hinds, LLC</u>, No. 05-CV-6399, 2007 WL 2571450, *9 (E.D. Pa. 2007) ("[Defendants'] claim that Gahagan's opinion is simply an adoption of Christmas's expert report is misguided.  Gahagan did . . . review Christmas's report and conclusions; however, he also reviewed the entire file in the case, taking into account and basing his opinion on the facts recited in Christmas's report, more than 60 photographs of the fire scene . . . Fire Marshal Lesnaik's report . . . and other evidence relevant to the fire's cause and origin.  Only then did Gahagan render an opinion as to the cause of the fire.  This is standard methodology for an expert who is unable to examine a fire scene-indeed, a defense expert retained after the fire scene can no longer be examined would be limited to reviewing similar evidence in order to arrive at an independent cause-and-origin conclusion.").

Defendants next challenge Panunto's use of the NFPA 921 guidelines, contending that he

misapplied the process of elimination set out in section 18.2.1.  (Id. at 16.)  They contend that the guideline makes clear that the process of elimination is not a viable method in high-damage situations or when other potential causes cannot be definitively ruled out.  (Id.)  Plaintiffs again argue that this criticism is merely disagreement with Panunto's conclusions.  (Doc. No. 35 at 5.)

Based on the current record, the Court cannot find that Panunto misapplied the NFPA 921 guidelines in a manner that made his methodology unreliable or caused his conclusions to lack good grounds.  In exhibit three of the attachments to Defendants' brief in opposition, section 18.2.1 provides:

> Any determination of fire cause should be based on evidence rather than the absence of evidence; however, when the origin of a fire is clearly defined, it is occasionally possible to make a credible determination regarding the cause of the fire, even when there is no physical evidence of the ignition source available.  This finding may be accomplished through the credible elimination of all other potential ignition sources, provided that the remaining ignition source is consistent with all known facts.

(Doc. No. 33-4 Ex. 3.)[3]  It is clear that the NFPA 921 guideline, which has been determined to provide a reliable method for fire investigation, endorses the process of elimination in certain

---

[3]  The Court notes that an expanded version of NFPA Section 18.2.1 was introduced as an exhibit at the hearing held on this matter.  (See Doc. No. 49-4.)  The hearing exhibit adds, *inter alia*, that:

> [a] clearly defined origin exists when it is known conclusively to the exclusion of all other potential origins.  The process of elimination is not to be used indiscriminately.  Whenever the origin is not clearly defined, this process is inappropriate and cannot be used.  Some of the conditions and circumstances that prevent the origin from being clearly defined include the degree or extent of damage . . . or the adverse effects of fire suppression activities . . . . The positive identification of the origin is the most significant factor in determining whether the process of elimination is appropriate.

(Id.)  It is not clear from the record why two distinct versions were provided, but nothing in the expanded version alters the Court's determination.

circumstances.  Of course, in following the NFPA 921 methodology, Panunto was required to make certain conclusions about the circumstances of the fire to determine whether the process of elimination was appropriate.  Here, Panunto concluded that the origin was clearly defined and that all other potential sources of fire in the area of origin could be credibly eliminated.  (Hr'g. Tr. at 37:8-10; 40:19-25)  The Defendants dispute Panunto's opinion that circumstances in this case justified use of this process of elimination, but, as above with Schriver, the Court finds that Panunto had at least good grounds for his conclusions and that there is not such a great gap between the data and the conclusion reached to render his opinion unreliable.

Finally, relying on Pappas v. Sony Electronics, Inc., 136 F. Supp. 2d 413, 423 (W.D. Pa. 2000), Defendants contend that Panunto's reliance on burn patterns inside the remains of the TV/VCR is the product of flawed methodology and that he needed additional testing to prove his ignition scenario.  (Id. at 16;18.)  Plaintiffs contend that the Pappas case is distinguishable and cite to Erie, 2005 WL 1165562 at 7, in support of Panunto's methodology.  (Id. at 6-7.)

In Pappas, a fire broke out in one corner of a house that held a (separate) TV and VCR. 136 F. Supp. 2d. at 415.  Plaintiffs' expert concluded that the fire started inside the TV due to internal damage to the television set and burn patterns showing the fire burned from the inside to the outside.  Id. at 418.  Despite this, the expert could not determine the exact component that caused the fire.  Id.  The court held that the Plaintiffs had failed to meet their burden under Daubert largely because they did not produce sufficient evidence that the expert's causation determination, based on burn patterns, was reliable:

> [f]or one, there was no evidence that fire investigators commonly look to the "burn pattern" inside a product to determine causation. In his expert report, Brugger noted that the fire started inside the television set because the "burn pattern would have been different"

> if it had started on the outside. Although his assessment seems
> plausible, I have no way of knowing whether this approach is the
> proper one for a fire investigator to take in determining causation.
> Plaintiffs did not cite any peer reviewed sources or present any
> testimony verifying the reliability of this technique. And they did not
> offer any witnesses, except Brugger himself, to support the reliability
> of this method.

Id. at 423. These deficiencies were especially problematic because the plaintiffs' expert

admitted that he did not feel bound to follow any of the widely accepted manuals for fire

investigation such as the NFPA 921. Id. at 424-25. The court also noted that the evidence that

was introduced, including testimony and affidavits from other experts, tended to show that

relying on burn patterns to determine a fire's cause (as opposed to origin) was not reliable and

that the plaintiffs expert had deviated from accepted methodology in several respects. Id. As

such, the court in Pappas concluded that it simply did not have the information necessary to

determine whether the plaintiffs' expert had reliably come to his conclusions. Id. at 426.

The Court agrees with the Plaintiffs that Pappas is distinguishable from the present

situation. Panunto has attested to following the methodology set out in NFPA 921. There is also

no evidence before the Court, other than Defendants' assertions, that Panunto significantly

deviated from that methodology. In following the NFPA 921 guidelines, Panunto noted burn

patterns in his report while collecting data of the fire's origin: "[b]urn patterns indicate that the

fire began inside the set, near or at, the VCR tape transport assembly . . . and then spread to the

TV section of the unit, and then spread to adjoining combustibles in the living room . . . ."

(Panunto Report at 2.) Panunto then concluded that the evidence is "consistent with the fire

starting inside the set." (Panunto Report at 3.) Having satisfied himself that the origin of the fire

was clear, Panunto made his causation conclusion based on the process of elimination

methodology set out in the NFPA 921 section 18.2.1, eliminating other potential sources of the fire in the area of origin. (Id.)

Based on the record and the discussion above, the Court is satisfied that the Plaintiffs have met their burden to show that Panunto followed reliable methodology and that he has at least good grounds for his conclusions.

**III.    CONCLUSION**

For the foregoing reasons, the Court will deny Defendants' motion to exclude (Doc. No. 32.)  An order consistent with this memorandum will follow.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HA. L. HOANG and NAM L. HOANG, | : | |
| | : | **Civil Action No. 1:07-CV-799** |
| **Plaintiffs** | : | |
| | : | **(Chief Judge Kane)** |
| v. | : | |
| | : | |
| FUNAI CORPORATION, INC. et al., | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

**AND NOW**, this 7th day of July 2009, upon consideration of the Defendants' motion to exclude expert testimony (Doc. No. 32) filed in the above-captioned matter, and for the reasons set forth in the Court's memorandum opinion filed herewith, **IT IS HEREBY ORDERED THAT** the motion is **DENIED**.

      _s/ Yvette Kane_____
      Yvette Kane, Chief Judge
      United States District Court
      Middle District of Pennsylvania